## HILL et al. v. STAMPFLI et al. (No. 11517.)

(Court of Civil Appeals of Texas. Fort Worth. March 27, 1926. Rehearing Denied May 8, 1926.)

**1. Mortgages ⬤⟿37(2).**

A deed absolute on its face may, by parol testimony, be shown to be a mortgage.

**2. Trial ⬤⟿142—Court is authorized to take question from jury when evidence is of such character that there is no room for ordinary minds to differ as to conclusions to be drawn from it.**

To warrant court in taking question from jury, evidence must be of such character that there is no room for ordinary minds to differ as to conclusions to be drawn from it.

**3. Mortgages ⬤⟿36.**

Plaintiffs, claiming that deed and option agreement executed by them was in fact a mortgage, have the burden of proof.

**4. Mortgages ⬤⟿39—Evidence held not to raise issue that deed and option agreement executed by plaintiffs was in fact a mortgage.**

Evidence *held* not to raise issue that deed and option agreement executed by plaintiffs was in fact a mortgage as claimed by plaintiffs, and hence court properly gave peremptory instruction for defendants.

**5. Mortgages ⬤⟿6—When debt forming consideration for conveyance is extinguished by express agreement, transaction is sale on condition.**

To constitute a mortgage, there must be a debt to be secured; and, when debt forming consideration for conveyance is extinguished by express agreement of parties, transaction is sale on condition, which grantor can defeat only by repurchase or performance of condition on his part within time limit for purchase.

**6. Vendor and purchaser ⬤⟿244—Evidence held insufficient to show that defendants had knowledge that prior conveyance, whereby defendants' grantor acquired title, constituted a mortgage or was intended as a mortgage.**

Evidence *held* insufficient to show that defendants, who purchased property from plaintiffs' father, had knowledge that conveyance by plaintiffs and their father to another, who in turn reconveyed it to father, was a mortgage or was intended as a mortgage.

**7. Estoppel ⬤⟿27(1)—Plaintiffs, joining with their father in conveying land inherited from mother, cannot set up alleged trust, as against grantee of father, to whom land had been reconveyed.**

Where plaintiffs, together with their father, executed valid mortgages on, and finally conveyed, property descending to them on mother's death, they thereby extinguished any right in property as against defendant, a subsequent grantee of father, to whom land had been reconveyed, and cannot set up alleged trust relation, in that defendant as grantee of father, who had only a life estate in property, held title in trust for plaintiffs.

Appeal from District Court, Wichita County; H. R. Wilson, Judge.

Action by Mary Cornwall Hill and another against V. E. Stampfli and another. Judgment for defendants, and plaintiffs appeal. Affirmed.

J. T. Montgomery and Kay, Akin & Smedley, all of Wichita Falls, and W. E. Forgy, of Archer City, for appellants.

Joseph H. Aynesworth and W. E. Wilson, both of Wichita Falls, and Thompson, Barwise & Wharton, of Fort Worth, for appellees.

CONNER, C. J. This suit was instituted by Edwin Hill and Mary C. Hill, son and daughter, respectively, of R. E. and Sallie C. Hill, to recover T. E. & L. Company survey No. 2408, containing 320 acres of land situated in Archer county, Tex. The defendants denied the allegations of the plaintiffs' petition and claimed under a deed from R. E. Hill to them. The suit, as finally cast by the pleadings and evidence, resolved itself into a contest of whether the following deed executed by R. E. Hill and his only children, Edwin and Mary C. Hill, was a mortgage, instead of a warranty deed, conveying full title as the defendants claimed, to wit:

"R. E. Hill, Mary Cornwell Hill, by R. E. Hill, Attorney in Fact, and Edwin Hill, to the Texas Company.

"Warranty Deed Dated the 16th Day of February, 1922.

"The State of Texas, County of Archer.

"Know all men by these presents: That we, R. E. Hill, a widower, Edwin Hill, a single man, and Mary Cornwell Hill, a feme sole, all of said county and state, for and in consideration of the cancellation and delivery to us by the Texas Company, a corporation of Texas, of our certain joint and several promissory note, payable to the order of the Texas Company, at Houston, Texas, in the principal sum of $6,936.46, said note dated June 18, 1919, bearing interest from date at the rate of 8 per cent. per annum, have granted, sold and conveyed and do by these presents grant, sell and convey unto the said the Texas Company, that certain lot, tract or parcel of land situated in Archer county, Texas, more particularly described as all of T. E. & L. Company survey

No. 2408, abstract No. 587, patent No. 196, vol. 22, containing 320 acres of land more or less, same being described by metes and bounds as follows:

"Beginning at the northwest corner of T. E. & L. Co. survey No. 2407, also the southwest corner of T. E. & L. Co. survey No. 2415, and southeast corner of T. E. & L. Co. survey No. 2409; thence south 1,344 varas to a stake for corner; then west 1,344 varas to a stake for corner; thence north 1,344 varas to a stake for corner; thence east 1,344 varas to the place of beginning.

"To have and to hold the above-described premises, together with all and singular the rights and appurtenances thereto in any wise belonging unto the said the Texas Company, its successors and assigns, forever, and we do hereby bind ourselves, our heirs, executors and administrators to warrant and forever defend all and singular the said premises unto the said the Texas company, its successors and assigns, against every person whomsoever lawfully claiming or to claim the same, or any part thereof.

"Witness our hands this 16th day of February, A. D. 1922. R. E. Hill. Mary Cornwell Hill, by R. E. Hill, Agent and Attorney in Fact. Mary Cornwell Hill. Edwin Hill.

"Above instrument acknowledged by R. E. Hill before Mary Byman, notary public in and for Wichita county, Texas, on May 15, 1922, and by Edwin Hill, before same official on the 17th day of July, 1922, and by Mary Cornwell Hill, before Arthur P. Rogers, a notary public in and for Cook county, Illinois, on July 5, 1922. All certificates in statutory form.

"Filed for record in Archer county, Texas, on the 29th day of July, 1922."

It was agreed that the land was the separate property of Sallie C. Hill, the mother of the plaintiffs, and that she was the common source of title. The record title of Sallie C. Hill began under a deed to her, executed on the 28th day of July, 1908. During the following year R. E. and Sallie C. Hill executed a trust deed, in the usual form, to the Texas Land & Mortgage Company to secure the sum of $1,800. This debt was not paid at maturity and they executed several trust deeds thereafter to different parties to secure specified sums advanced for the purpose, among other things, of discharging the original obligation for $1,800. This process continued from time to time until the 28th day of February, 1914, upon which day R. E. Hill and wife executed a trust deed covering the land in controversy to secure the payment of $4,000 to W. L. Seibold. Sallie C. Hill died during this year, and later R. E. Hill, joined by the plaintiffs in this case, Edwin and Mary C. Hill, executed at various times several trust deeds securing sums of money advanced for the payment of previous debts, none of which having been paid, and, being pressed for payment by the Texas Company, which had in the meantime by proper assignments succeeded to the rights and equities of the previous holders of the notes and trust deed mentioned, further duly executed and delivered to the Texas Company, in settlement, the warranty deed hereinbefore copied.

In the negotiations resulting in the execution of the deed just mentioned, the evidence tends to show that it was agreed between the negotiating agent of the Texas Company and R. E. Hill that the title could be reinvested in the parties to the deed upon certain conditions, pursuant to which the following instrument, designated as an option agreement, was executed by the Texas Company, to wit:

"Option Agreement.

"State of Texas, County of Harris.

"Dated the 1st Day of March, 1922.

"Know all men by these presents: That the Texas Company, a corporation of Texas, acting herein by C. N. Scott, its vice president, for and in consideration of one dollar and other valuable considerations to it in hand paid by R. E. Hill of Young county, Texas, receipt whereof is hereby acknowledged, has granted and does hereby grant, unto the said R. E. Hill, his heirs and assigns, the sole and exclusive option to purchase at a price hereinafter more fully set out at any time prior to 6 o'clock p. m., February 16, 1923, that certain tract or parcel of land situated in Archer county, Texas, known as T. E. & L. Co. survey No. 2408, abstract No. 587, patent No. 196, vol. 22, containing 320 acres of land more or less, save and except therefrom the oil, gas and mineral lease acquired by said the Texas Company prior to the time it acquired the fee-simple title to said land, reference to which lease and the record thereof in the Deed Records of Archer county, Texas, is here now made for all purposes, said leasehold and all rights, titles and estates incident thereto are expressly reserved from this option and will be reserved from any conveyance growing out of the exercise thereof.

"If during the term of this option the said R. E. Hill, his heirs or assigns, shall elect to exercise same, he or they shall pay or tender to said the Texas Company, at Houston, Texas, in cash, the sum of eighty two hundred and six ($8,206.00) dollars plus any and all sums that may hereafter be paid by said company for taxes, insurance, repairs and upkeep together with interest on said $8,206.00 from February 16, 1922, and interest on such other sums from the respective dates of their payment to date of such tender at the rate of 8 per cent. per annum, less such rentals and payments which might have become due to the owner of said 320 acres of land under the terms of the oil, gas and mineral lease above referred to had such owner been some person other than said the Texas Company, and less the further sum which may be realized as the net profit accruing to said the Texas Company from the cultivation of said land, provided this last sum has actually been collected by said company upon such payment or tender in cash of the aggregate amount to be arrived at in the foregoing manner to said the Texas Company at Houston, Texas, said company will cause a proper deed of conveyance to be executed and delivered to the said R. E. Hill, his heirs or assigns hereunder covering the interest and estates covered by this option.

"If this option is not exercised by said R. E. Hill, his heirs and assigns, prior to 6 o'clock p. m., February 16, 1923, this instrument shall become null and void and of no further force and effect and all rights granted hereby shall terminate."

The Texas Company had, previously to the execution of the instruments last mentioned, duly acquired an oil and gas lease on the lands in controversy, which expired in September, 1923. The sums specified in the instrument designated as an option agreement not having been paid at the time therein fixed, the Texas Company, acting by T. J. Donahue, its vice president, on April 10, 1923, reconveyed (with certain exceptions to be hereinafter stated) to R. E. Hill the land in controversy by a deed in regular form and with the usual covenants of warranty for a recited consideration of $8,972.48 in cash, after which, on April 11, 1923, R. E. Hill, by general warranty deed in usual form, conveyed the land in controversy to the defendants I. H. Roberts and V. E. Stampfli for a recited consideration of $4,000 in cash and the conveyance of certain property by the grantees to R. E. Hill. It is under this deed that the defendants below and appellees here claim.

A jury was impaneled to try the issues presented in the pleadings and evidence heard, at the conclusion of which the plaintiffs requested a peremptory instruction to the jury to find in their favor. The defendants likewise presented a request for a peremptory instruction for a finding in their favor. The court sustained the motion of the defendants and instructed the jury to so find. This was done and judgment rendered accordingly. From the judgment so rendered the plaintiffs have appealed and assign error to the action of the court in giving the peremptory instruction in favor of the defendants.

The controlling issues presented by the parties are, first, whether the deed of R. E. Hill and plaintiffs to the Texas Company on February 16, 1922, was a mortgage intended as security for a pre-existing debt, and whether it continued to be such until and at the time of the reconveyance by the Texas Company to R. E. Hill, on or about April 10, 1925; and, second, whether the defendants Roberts and Stampfli had notice of such facts.

[1] That a deed absolute on its face may be shown to be a mortgage by parol testimony is not disputed and cannot be denied. Should the judgment be construed as a finding on the part of the court in the defendants' favor, we think, without doubt, that the evidence is sufficient to sustain such a finding, in which event the judgment below should be affirmed. Appellees assert the proposition that both parties, at the conclusion of the evidence having requested an instructed verdict in their favor, thus elected to take the action of the court as final, and that neither can be heard to complain of the court's action resolving any issue against them or in failing to submit the issues to the jury. This proposition seems to be supported by the case of Tiblier v. Perez (Tex. Civ. App.) 277 S. W. 189, and cases therein cited. If we felt able to adopt the proposition so asserted in this case, we would see no difficulty in affirming the judgment, but the record discloses that, in addition to the peremptory instruction requested by the plaintiffs, they further specially requested the court to submit the issues to the jury in event of a refusal of the peremptory instruction. In this respect the case before us is distinguishable from the case cited, and, in view of our statutes which require the court to submit the issues invoked by the pleadings and evidence to the jury, we feel unable to dispose of the case on a question of the sufficiency of the evidence. We think rather that the duty now devolving upon us is to determine the question as to whether the state of the evidence is such as to raise the vital issues heretofore indicated, and we will therefore address ourselves to those questions.

[2] Our Supreme Court, in the case of Lee v. I. & G. N. Ry. Co., 89 Tex. 583, 36 S. W. 63, said:

"To authorize the court to take the question from the jury, the evidence must be of such a character that there is no room for ordinary minds to differ as to the conclusion to be drawn from it."

The rule so announced is quite familiar and additional authorities to the same effect need not be cited.

In 1868, Justice Willis, in Ryder v. Wombwell, L. R., 4 Exch. 32, said:

"It was formerly considered necessary in all cases to leave the question to the jury if there was any evidence, even a scintilla, in support of the case; but it is now settled that the question for the judge (subject, of course, to review) is, as stated by Maule, J., in Jewell v. Parr, 13 C. B. 916 (E. C. R. vol. 76), not whether there is literally no evidence, but whether there is none that ought reasonably to satisfy the jury that the fact sought to be proved is established."

The rule thus announced in Ryder v. Wombwell was approved by the Supreme Court of the United States in the cases of Improvement Co. v. Munson, 14 Wall. 442, 20 L. Ed. 867; Board of County Commissioners v. Clark, 94 U. S. (4 Otto) 278, 24 L. Ed. 59; Griggs' v. Houston, 104 U. S. (14 Otto) 553, 26 L. Ed. 840. The rule so stated has also been approved by our own Supreme Court in the case of Joske v. Irvine, 91 Tex. 574, 44 S. W. 1059. Mr. Justice Denman there said:

"From a careful examination of the cases it appears (1) that it is the duty of the court to instruct a verdict, though there be slight tes-

timony, if its probative force be so weak that it only raises a mere surmise or suspicion of the existence of the fact sought to be established—such testimony in legal contemplation falling short of being 'any evidence'; and (2) that it is the duty of the court to determine whether the testimony has more than that degree of probative force.

"If it so determines, the law presumes that the jury could not 'reasonably infer the existence of the alleged fact' and 'that there is no room for ordinary minds to differ as to the conclusion to be drawn from it.' The broad and wise policy of the law, formed in and descending to us through the crucibles of time, does not permit the citizen to be deprived of his property, his liberty, or his life upon mere surmise or suspicion, and places upon a trained judiciary the grave responsibility of determining, as a question of law, whether the testimony establishes more."

With the rules so indicated the statement of facts in this case has been read three times, twice by the writer in its entirety and again in consultation with his associates, and we have all concluded that we are unable to say that the trial court committed reversible error in giving the peremptory instruction complained of.

R. E. Hill, Edwin Hill, and Mary C. Hill all testified as witnesses on the trial. No one of them testified that the intent of the parties at the time of the execution of the warranty deed to the Texas Company on the 16th day of February, 1922, was that it should operate as a mortgage and constitute security for the debts then due from the Hills to the Texas Company; nor did any officer or agent of the Texas Company dealing with the transactions so testify. The plaintiffs introduced the correspondence passing between the agents of the Texas Company relating to the transactions. Mr. McMahon, who was the chief official and general superintendent of the Texas Company for the Wichita Falls district, which included Archer county, wrote, on July 18, 1922, to A. H. Culver, of Houston, who was the chief officer of the Texas Company having general supervision of the lease department, inclosing the deed hereinbefore copied, conveying the land in controversy to the Texas Company, and reciting that the "instrument giving him (R. E. Hill) an option to redeem this land prior to 6 o'clock p. m., February 16, 1923, and note, was delivered to Mr. Hill." The writer of the letter further states:

"I presume the deed of trust should be released and the papers in connection therewith forwarded to Mr. Hill."

It will be noted that the deed from the Hills to the Texas Company, conveying the survey, recites that it was executed "in consideration of the cancellation and delivery to us by the Texas Company" of the note that had been executed by the Hills to the Texas Company for $6,936.46.

The letter and instrument referred to were offered in evidence by the plaintiffs and neither they nor R. E. Hill denied that the evidences of debt had been released and returned duly canceled. During the time specified in the option agreement, to wit, from February 16, 1922, to February 16, 1923, the taxes were paid and ground rents collected by the Texas Company, and we find no action or declaration on the part of the authorized agents of the Texas Company that can be justly held repugnant to the spirit of the deed and option agreement as evidenced by their terms.

The plaintiff offered in evidence a number of letters and telegrams passing between the executive officers of the Texas Company. On July 25, 1922, Mr. Culver wrote to Mr. Foster, an officer of the company, stating:

"We hand you herewith original and one proof read copy of deed from R. E. Hill et al, to the company, dated February 16, 1922, covering in fee simple T. E. & L. Company survey No. 2408, in Archer county, Texas. * * *

"In explanation of above, will say we had this and other land under our lease No. 12053, and to protect our lease from foreclosure proceedings bought in a prior lien amounting to $9,936.46, dated June 18, 1919, with interest at 8 per cent, per annum, semiannually. While this deed merely recites the cancellation of note and accrued interest, it only gives the amount of the note and not the interest, but from correspondence from Mr. Kilgore, who handles this matter, he seemed to have figured the total as being $7,460, after certain credits were made.

"When deed was executed to us, we executed an agreement, and delivered same to Mr. R. E. Hill, giving him the option and privilege of repurchasing this land at a consideration of $8,206, he to exercise his option by February 16, 1923. * * *

"Photostat copy of this option to repurchase is handed you herewith. * * *

"P. S. We are also inclosing duplicate release of the deed of trust which we have delivered to Mr. Hill."

On August 24, 1922, J. L. De Mars, another officer of the company, wrote to Mr. McMahon that his attention had been called to the fact "that under the transfer of title to us the right to redeem rests with Mr. Hill, allowing him to recover same, for at least one year."

J. E. Kilgore, witness for the plaintiff, testified:

That he was the attorney who negotiated the settlement with R. E. Hill; that when the note was past due it was placed with him for collection and he took the matter up with Mr. Hill; that he was pressing Mr. Hill for payment and said almost everything to him that he thought would bring about a payment, and that he wrote Mr. Hill that unless he got the deed executed in evidence he was going to call on the trustee to sell the land; that when he (Hill) came to him he agreed to execute the deed, "and at the same time I agreed to execute what you call the defeasance agreement. I could not execute that instrument by which

the Texas Company, on certain conditions, agreed to deed the land back to them. I did not have authority to execute that, as I was not an official of the company."

On August 28, 1922, McMahon wrote to De Mars, stating, among other things:

"We do not think, however, that there is the remotest idea that Mr. Hill will exercise his option and take the property back."

Mr. McMahon wrote to Mr. Culver, on January 23, 1923, stating that R. E. Hill had been in his office recently and advised that he intended to exercise the option granted him and redeem or purchase the T. E. & L. Company survey No. 2408, which option expired at 6 o'clock p. m., February 16, 1923, and he asked for the total amount which it would take to redeem this land. In reply, on January 25, 1923, Culver wrote to McMahon, stating:

That his (R. E. Hill) contract of repurchase "provides that we are to be repaid in cash the sum of $8,206, plus all sums paid by us for taxes, insurance, repairs and upkeep, with interest on any other sums from their respective dates of payment at the rate of 8 per cent. per annum."

The letter then sets out the several sums which aggregated $9,352.88, and further stated:

"I do not know if any other payments have been made, and those to whom I am sending copies hereof will check their records to. see if such is the case, so that they can be included in the repurchase price. * * *

"We have figured the interest to February 16th, the final date for him to exercise his option, and it will be that time probably, if our past dealings with Mr. Hill are any criterion for the present case. Of course, if he pays off sooner, the interest wil have to be recalculated accordingly."

On February 5, 1923, Mr. Culver wrote to Mr. McMahon referring to an additional amount to be added to the Hill account, and stated:

"At the best, all we are going to get out of this is the money we have put into it. We have expended the money and several years of aggravation and worry. We are of the same opinion as you; that is, that he does not intend to redeem the land. In case he does not do so, is this land worth the amount of money we have put into it, either from the surface or mineral standpoint?"

After the expiration of the option agreement, to wit, on March 13, 1923, J. E. Kilgore wrote to J. H. Culver that:

"Mr. R. E. Hill has informed me that he has worked up a trade whereby he can pay in cash to the Texas Company all the money that the Texas Company has been out, provided the company is willing, at this time, to convey the land to his purchaser subject, of course, to the oil, gas, and mineral lease covering the same.

284 S.W.—16

He informed me that, if the company is willing to this arrangement, the matter can be closed within ten days.· Will you please advise me, by wire, upon receipt of this communication whether or not the executives are willing to this arrangement, which will amount simply to an extension of the option previously given Mr. Hill. If the executives will not accept this proposition, but are willing to sell for a cash consideration subject to the mineral lease, please advise by wire the amount."

On March 17th Culver sent a telegram to McMahon as follows:

"It is our opinion that the only trade we should make * * * is to sell for the total amount which we have been out, including Kilgore's fee, the Texas Company to retain all minerals in the fee with agreement to pay one-eighth royalty if and when we should elect to drill but drilling at all times to be at our option. We would not care to have any time limit upon our mineral rights. Advise Kilgore."

On March 19th McMahon wired Culver:

"I am afraid that the conditions of our telegram will make it impossible for Hill to make any kind of trade and that we will still retain the fee. I believe this is romping on him too hard and that we should not be in that attitude unless we want to leave the investment in that land and I do not think we should. It seems to me that in event we can retain the mineral on the north half in line with the balance of your telegram it would be all that we should expect from this seventy-three year old man who is down and out and then too I believe some limitation should be put on our mineral right whatever trade made."

On April 9th, Kilgore wired to Culver:

"Please forward immediately properly executed deed in line with your telegram reserving minerals for fifteen years on north half with obligation only to pay royalty on any production."

On the same day, to wit, April 9th, Culver wired to Kilgore: .

"Will have deed prepared along lines of mine of March thirteenth to Mr. McMahon, that is, we reserve the minerals under the north half charged with one-eighth royalty favor of grantee. Drilling to be wholly at our option and minerals to pass to grantee if we or our assigns do not drill upon said land prior to fifteen years from date of instrument."

The plaintiffs offered in evidence a portion of the testimony given by V. E. Stampfli, one of the defendants on the trial of the case of Roberts & Stampfli v. Hill. This was to the following effect: That, in addition to some houses given to Mr. Hill in the purchase from him, he gave $4,000 in money and loaned him $2,500 to pay the Texas Company off, and took a mortgage back on the houses. He testified:

"I didn't want to make the trade on account of some things being tied to it, and finally Mr. Hill told us in the office he was going to lose

the whole business if the trade didn't go through, and he said: 'The only thing you fellows are losing is the 15-year lease, and if they get anything you will get the royalty, and you are not out anything, except the rentals. * * *'

"We gave him for the place some houses in Wichita Falls that we valued at $16,000; I think that is the figures. That was a fair valuation. We also gave him $4,000 in money and then loaned him some money. The net price of the land to me and Mr. Roberts was $20,000, and I considered it worth that much."

Plaintiff further offered the testimony of Mr. I. H. Roberts as follows:

"I think we estimated those houses at $16,000 in the deal. In my opinion, that was a trading price, the same as was on the land. It would be hard to tell what was the real value of those houses, real estate values fluctuate. I would say from $12,000 to $14,000. * * * The old man told me he just had a limited time to make this trade."

Mr. Stampfli was also called as a witness by the plaintiffs, and, after stating that he had examined the land, etc., he testified that:

"In making that deal, Mr. Crane, Mr. Roberts, Mr. R. E. Hill, Mr. Wilson, and myself were the parties that made it, and Mr. Hill's son came over to the office once or twice and urged me to go ahead and trade with his father. He said his father was 75 years old and was living down on the farm by himself, and they wanted to move up to Wichita Falls, and his father could take care of the houses better than the farm, and they would pay him $150 per month, and urged me to make the deal, and I didn't want to buy the farm because there was strings tied to it; we were giving him a clear title to the houses and that was the way I wanted to buy it."

On cross-examination he testified, among other things, that:

"Edwin Hill did not tell me anything about claiming any interest in the farm—he was not claiming anything. * * * Mr. R. E. Hill told me the Texas Company had a deed to it and he had had an option on it, and the option had expired, and the only way he could fix the deed now was for him to buy the land back and trade according to the way they dictated it—I mean the way the Texas Company dictated it. He said the Texas Company was demanding a 15-year lease on the north end of the farm, without any rentals, and then I told him I didn't want to have anything to do with it; I didn't want to buy anything with strings on it. * * * He (R. E. Hill) first mentioned this option contract when he came back the second time. He told me he had an option contract to buy it back from the Texas Company within a certain length of time, and it had expired, and he had lost his farm. I think he repeated that statement a dozen times. * * * When he first mentioned this 15-year lease proposition I did not trade with him. I think it was 10 or 15 days before we finally traded. When we agreed to accept the second proposition with the 15-year lease, we agreed on that we was to get everything, but the rentals on the north end,

and the south end was clear, and then I told him to go to our attorney, W. E. Wilson, and take him the abstract and let him fix up the papers and pass on it, and if he passed on it I would trade. * * * When I said I didn't want to take this land with any strings on it, what I meant was that we were giving him a deed to our houses clear of any indebtedness and that is the way I wanted to buy the farm, and he couldn't deliver the farm without that lease on it, and I didn't want it that way. That was my only objection. He couldn't deliver it without accepting that lease and I didn't want it that way. That is what I meant by the strings on it. I wanted a clear title, and wanted the farm free, like we traded him the houses."

Edwin Hill was a witness in his own behalf. He stated his relation to R. E. Hill and to his coplaintiff, Mary C. Hill, the date of his mother's death, and that Mary C. Hill lived at Evanston, Ill., and was not able to come to the trial, and further that:

"In 1919, I, together with my sister and father, signed a mortgage to the Texas Company, and after that I, together with my sister and my father signed a deed to this land to the Texas Company."

We have thus referred to and given the contents of such letters, telegrams, and testimony as was relied on by appellants as showing that the deed to the Texas Company and the option agreement, when construed together, constituted but a mortgage on the land in controversy. At no place in all the testimony offered upon the trial do we find any expression in the lease, telegrams, or testimony of a witness, when construed in the light of the whole testimony, that authorizes the conclusion that appellants' contention can be sustained. The only circumstance that can be reasonably construed, as we think, as tending to show that the deed was a mortgage, is the testimony tending to show that the land in controversy was of a greater value than the amount of the indebtedness of R. E. Hill and the appellants to the Texas Company, and the force of this circumstance is clearly weakened, if not entirely destroyed, by the facts otherwise appearing in the evidence that the Texas Company was in the oil business, did not desire to make investments in real estate; that sympathy was expressed for the condition and age of R. E. Hill; and that, in addition to the indebtedness computed for the purpose of ascertaining the cash consideration to be paid for the reconveyance to R. E. Hill, the Texas Company demanded and received a 15-year lease on the north half of the survey in controversy without obligation to drill or to pay rentals, and no proof appears in the record showing the value of such lease at the time. That it later proved to be of considerable value is indicated by the fact that the appellants, in addition to seeking recovery of the land, also sought to recover the value of oil later discovered

and taken, as we infer, from the north half of the survey which the Texas Company reserved in the reconveyance to R. E. Hill.

Before finally passing upon this branch of the case, we should refer to certain evidence offered by appellants, but excluded by the court. In the first bill of exception it is stated that, while John E. Kilgore was on the stand, the appellants propounded to the witness the following question:

"At the time you delivered the deed from Hill, and his children, to the Texas Company, did you express any opinion of the Texas Company as to the character of that instrument, or the legal effect of it, and as attorney for the Texas Company, and as being actively in charge of the negotiations with R. E. Hill at the time you were pressing him for settlement of the deed of trust, state whether or not when you got that deed from Hill, and the children, naming the Texas Company as grantee, in view of all that you knew about it being a pre-existing debt, and in view of this instrument, which had been prepared or agreed on, and was prepared and delivered, by which the Texas Company under certain conditions agreed to deed it back to him, and which provided for interest, and in view of the fact that the consideration in the deed was the exact amount of the debt, and in view of the fact that the amount which the defeasance agreement called for as a payment, in the event the Texas Company delivered the deed back to him, and that that instrument also bore interests, state whether or not, in your view at that time, the instrument, in view of all these circumstances, was a mortgage?"

The defendants objected to the question and answer, on the ground that it called for a conclusion of the witness, and the court sustained the objection. We think it evident that the question called for an answer that was inadmissible. It called for a conclusion that was for the jury or court to reach and not the witness, in addition to which the testimony of the witness, as shown in the bill of exception, had it been admitted, fails to show that at the time R. E. Hill and appellants executed the deed to the Texas Company it was then said or understood on the part of the Hills, or even of the witness, that the deed and option agreement amounted only to a mortgage. The testimony offered and excluded under the questions stated, as shown by the bill, is as follows:

"Identifying the matter inquired of, as to time, I cannot answer your question, but as I recall it, it was either at that time, or before that time, or soon after that time, that it occurred to me that it would likely be necessary, in case Hill did not exercise his option, to obtain from him, and the children, a quitclaim deed, and I wrote a letter to this effect to a man named 'Culver,' and if you have that letter, it will show when this idea struck me. The reason I was thinking that I might require quitclaim deeds was that the whole transaction might have the legal effect of being nothing more nor less than a mortgage, and I possibly said to you at one time that that was all it was.

"When I originally went into the negotia-

tions, I told Mr. Hill that this would absolutely divest him of title in the event he did not pay the amount of this debt. In my mind, at some time before the delivery of the deed, or at the time of the delivery, it occurred to me that this transaction might be considered a mortgage, and that it would be necessary to obtain another instrument from him, and his children. At one time I told Mr. Hill that he would be bound by the deed absolutely and I told the Texas Company that it was in all probability a mortgage. It was either before the negotiations were closed, or after that, that it occurred to me that it might be considered a mortgage."

It thus affirmatively appears that at the time of the negotations R. E. Hill was expressly told that he would be absolutely divested of title, and the fact that it later occurred to the attorney that it might possibly be construed as a mortgage can have no material effect upon the conclusion.

Certain testimony of Edwin Hill was also offered while he was a witness on the stand. A bill of exception to its exclusion shows that he was seeking to tell the jury the manner in which the matter of the execution of the deed came up and explain the circumstances under which the deed was executed, and he was asked:

"To explain fully what the agreement was between you and your sister and the Texas Company at the time of the execution of this deed. as to the purpose of the deed, and as to what was to be done by the Texas Company, and what rights you and your sister would have, if any. in the land after the execution of the deed," etc.

He would have testified, as shown by the bill of exception, as follows:

"That he, when he executed the deed to the Texas Company, do so upon the representations of his father to him that there was an agreement with the Texas Company to the effect that the debt might be paid at any time by the 16th of the following February, and that in that event the property would be reconveyed to the owners, that is, to R. E. Hill; that he relied upon that statement in executing the deed, and delivered it to his father; that he never at any time knew anything about the so-called option or defeasance contract, and never knew that such a contract existed, or the contents of it, and never knew there was an agreement that, in the event any money was paid to the Texas Company, a reconveyance should be made to R. E. Hill; that he did talk to Mr. Stampfli about the purchase, by Stampfli and Roberts on one occasion, of the land in controversy; that at that time he understood that the proposed purchase was to be from his father and he and his sister, and supposed at that time they would be called upon to approve any contract made and to execute a proper conveyance; that, in fact, he never approved the sale as made and never was called upon to execute any conveyance; that he received none of the consideration whatever and has never obtained any advantage whatever by reason of the same, and so far as he knows his sister has received nothing; that

his father, since the death of his mother, has had complete control and management of the business including the land business, both of the community estate and of his mother's separate estate; that his sister has been in Illinois all this time teaching, and he was engaged in other business, and has called upon his father entirely to manage the business; that he never at any time consented to any agreement by which the Texas Company, in the event it should be reimbursed or paid what was claimed to be due it in the amount named in the option agreement, should, in that event, convey the same to R. E. Hill."

We find nothing in this testimony, had it been admitted, to change our general conclusion. It will be noted that in the offered testimony it is not stated that at the time he executed the deed to the Texas Company he understood it to be a mortgage, or that it was so explained to him. It does not appear in the record that he ever objected to the execution of the several trust deeds leading up to the transaction or to the execution of the deed in question, and the fact that his father, who had been managing the business apparently with the consent of appellants, failed to explain to him about the option agreement and of its character, certainly could not bind the appellees without notice of the circumstances which had not been shown.

Appellants also offered testimony of R. E. Hill reciting circumstances otherwise appearing in the record, and that:

"At the time of the execution of the deed from R. E. Hill, Edwin Hill, and Mary Cornwall Hill, the Texas Company had been pressing for payment of their mortgage and threatening to foreclose; that at that time the financial conditions throughout the county were very hard, and he was utterly unable to raise the money, and that his son and daughter were likewise unable to raise it, and that the Texas Company suggested to him that he make a deed, and that they would deed it back to him if he paid the debt with interest within a year; that they insisted on this deed, and that he gave it reluctantly, and that he induced his children to sign said deed by saying to them that, if they could pay the debt and interest within a year, including past due interest, the land would be deeded back to them; that, when the supplementary contract, herein called the defeasance agreement or option agreement, by which the Texas Company agreed to deed the land back to R. E. Hill, was executed, his children, Mary Cornwall Hill and Edwin Hill, did not know that such written contract had been executed or that it was recorded, and that, so far as he knows, they never saw it or heard of it until after the deed to Stampfli and Roberts was made; that, when said deed was so made to the Texas Company, the Texas Company reserved an oil and gas lease upon the land, T. E. & L. Company survey No. 2408, and that, long after the deed had been delivered to them and the supplemental contract delivered back to him, the witness, the Texas Company paid to him and he received the annual rentals upon the oil and gas lease; that, at the time he made the contract with the Texas Company for the deed and the contract by which they were to convey the land back to him upon certain conditions, such contract was with W. B. Corlett in part and with John Kilgore, an attorney at Wichita Falls, in part; * * * that John Kilgore, attorney for the Texas Company, advised him he would get the land back if the debt and interest was paid," etc.

[3] The testimony was excluded, but we find nothing in this to modify our conclusion as originally announced. The deed to the Texas Company and the option agreement are instruments in writing, solemnly executed, and there can be no doubt of the legal proposition that the burden was upon appellants to show that their legal effect was otherwise than as indicated by their plain terms. As said by the Supreme Court of the United States in the somewhat similar case of Howland v. Blake, 97 U. S. 624, 24 L. Ed. 1027, where the reformation of certain written instruments was sought:

"If the proofs are doubtful and unsatisfactory, if there is a failure to overcome this presumption by testimony entirely plain and convincing beyond reasonable controversy, the writing will be held to express correctly the intention of the parties. A judgment of the court, a deliberate deed or writing, are of too much solemnity to be brushed away by loose and inconclusive evidence."

See, also, Railway Co. v. Garrett, 52 Tex. 133, where it is said:

"It has been repeatedly held by this court that, to ingraft a parol trust upon a deed, the testimony should be clear and satisfactory, and should be scanned 'with a strict and scrutinizing eye.'"

[4] After a most patient investigation of of the entire case and of all the evidence, we think the evidence altogether too inconclusive to establish appellants' proposition that the deed to the Texas Company, when construed with the option agreement and other evidence, was a mortgage, as asserted by them, and that hence the court committed no error in giving the peremptory instruction in favor of appellees.

[5] It is undoubtedly true, under the authorities, that, in order to constitute a mortgage, there must be a debt to be secured; and, when the debt forming the consideration for the conveyance is extinguished at the time by the express agreement of the parties, then it must be deemed purchase money, and the transaction will be a sale on condition, which the grantor can defeat only by a repurchase or performance of the condition on his part, within the time limit for the purchase. See Ruffier v. Womack, 30 Tex. 343; Hubby v. Harris, 68 Tex. 91, 3 S. W. 558.

[6] But, if by any reasonable construction of the evidence it can be said that we are in error in our general conclusion that the

deed to the Texas Company with the concurrent option agreement extinguished the previous debt of the Hills and constituted the transaction a conditional sale, it would still be necessary, in order to entitle appellants to a recovery, that the evidence be such as to show that appellees had notice of the true character of the transaction, and this, we think, the evidence wholly insufficient to show. There is nothing in the evidence, as we construe it, to show that the appellees had notice of the private conversations between appellants and their father, or of statements in the letters referred to, nor other evidence of probative force sufficient to put them on inquiry as to these matters. Nothing in the evidence shows that either R. E. Hill or Edwin Hill or any one else, stated to appellees before their purchase that the transaction between the Texas Company and the Hills constituted a mortgage or was intended as a mortgage. All of the statements, as we construe them, of R. E. Hill and Edwin Hill to appellees during the negotiations resulting in the conveyance of the property to appellees, are consistent with the terms and legal effect of the conveyance and option agreement under consideration. The mere fact that one of the appellees understood that there were "strings" to R. E. Hill's title was explained, with no contradiction, to mean that Hill could not convey without a reservation of the 15-year oil and gas lease. Testimony on the part of appellees is to the effect that they relied upon the abstract of title that was furnished and the opinion of their attorney as to what it evidenced, and the abstract of title included in the statement of facts merely shows the original deed to Sallie C. Hill, the various trust deeds heretofore mentioned, the deed to the Texas Company, and the option agreement. These instruments were all of record and we see no reason why appellees might not rely thereon. While the evidence shows that Edwin Hill did not know of the option agreement at the time it was made, the information he received was not out of harmony with its terms, and he must be affected with notice of its contents and effect, as recorded. It had been recorded some time before the conveyance to appellees, yet appellant Edwin Hill, though cognizant of the negotiations between R. E. Hill and appellees, said nothing to them reasonably calculated to generate a belief that he was claiming that the transaction with the Texas Company amounted to no more than a mortgage, and that he himself had an individual right beyond the power of his father to convey.

[7] Appellants have a further claim that the property in controversy through inheritance from their mother belonged to them subject only to a life estate of their father, and that of this appellees had notice, and that hence R. E. Hill held, and appellees now hold, the title to the land in controversy in trust for them.

In our consideration of the case, we have been unable to give the contention the weight that appellants seem to attach to it. The deed to Sallie C. Hill, the mother of appellants, gave notice that it had been executed by the Lewisville Trust Company by the direction of a chancery court in Kentucky in a suit wherein R. E. Hill and others were plaintiffs against William Cornwall and others. William Cornwall was the father of Sallie C. Hill. But nothing in the deed itself conveys notice that the title so acquired was not on an onerous consideration, while it does show that it was executed during the marriage relation of Sallie C. and R. E. Hill, which, under our statutes, constituted the property conveyed presumptively community property.

It is contended in behalf of appellants that the recital of the deed was sufficient to put appellees upon inquiry as to the issues involved in the chancery suit. The issues in that case are not shown in the evidence before us and we are not prepared to adopt such conclusion.

In Slayton v. Singleton, 72 Tex. 209, 9 S. W. 876, it was held, in effect, that under our registration statutes, which are collated, a bona fide purchaser was not affected by the probate of a will in Tennessee before its probate in this state. And it seems to us that under such circumstances it would impose an unauthorized burden upon a bona fide purchaser of lands in Texas to hold them affected by the chancery pleadings referred to. However, the parties on trial below agreed that the land in controversy was the separate property of Sallie C. Hill, but it was not agreed that appellees had notice of this fact, unless the instruments of record relating to the title conveyed such notice to appellees at the time of their purchase, and this we do not think has been shown. But if we assume, for the purposes of the argument, that the land in controversy was, as agreed, the separate property of Sallie C. Hill, and that appellees had notice thereof at the time of their purchase, it would yet seem to us to be immaterial, so far as necessary to be considered in this case, for it is undoubtedly true under our decisions that a married woman has the power during marriage to mortgage her separate property to secure her husband's debts. See Speer's Marital Rights, §§ 179 and 224. The fact that she did so mortgage the property in controversy several times before her death is undisputed, and the property descended to appellants burdened with the debts so secured. After her death, as already stated, Edwin and Mary C. Hill joined with their father, without objection, in the execution of valid mortgages and in the final convey-

ance to the Texas Company. So, that any right as against appellees was extinguished by the proceedings already referred to. Hence it cannot be said that any trust relation between appellants and appellees existed. A trust relation may, indeed, exist between their father and appellants, and appellants may be in a position and have the right, as to him, to the proceeds of the sale by R. E. Hill to appellees; but this question, of course, is not before us.

On the whole, we conclude, for the reasons stated, that the judgment below should be affirmed.

### On Motion for Rehearing.

Appellants have presented an exceptionally forceful motion for a rehearing, and request additional findings in event the motion for rehearing be overruled.

While from the face of the motion it may not appear that we were clearly right in all the views expressed in our original opinion, we, nevertheless, do not feel prepared to now reverse them. This is expressly true as to the issue of notice to appellees of the asserted rights of appellants. As we view the evidence, no statement or fact brought to the knowledge of appellees is sufficient to cause a man of ordinary care and prudence to doubt the title they were getting. The record title showed a conveyance of all title of. every character in R. E. Hill and appellants to the Texas Company, subject only to the terms of an optional agreement to reconvey which had expired, thus investing the Texas Company with full authority to convey title to whomsoever and upon such terms as it pleased. The conversations with R. E. Hill, Edwin Hill, and the other instruments of the record title were not out of harmony, as it seems to us, with the legal effect of the conveyance to the Texas Company and the option agreement. If these instruments were as they purported to be, it was immaterial that the property involved was theretofore the separate property of the mother of appellants, for in that event all interest in appellants, whatever it was, passed out of them.

The additional findings requested are numerous. In some instances they present views of the evidence with which we cannot concur; in other instances evidence is referred to which should be read in connection with other evidence to be found in the record in order to avoid a misleading effect, and to now undertake to segregate, add, and discuss such explanatory evidence would extend our opinion, perhaps already too long. Indeed, it may well be said that we could, and perhaps should, have disposed of this case by the simple statement and conclusion that the evidence had been examined and considered and that we thought it justified the trial court's peremptory instruction, for the vital

questions for determination were questions of law and not of fact. The question is, Does the evidence introduced, together with that offered, raise the vital issue? If it does, the court should have permitted the case to go to the jury. There is and can be no 'dispute as to just what evidence was heard and what was offered to enable our Supreme Court to review our action or that of the trial court. We shall assume that that court will, in the orderly performance of its functions, necessarily read and consider the evidence referred to and correct any misstatement, material omission, or error we may have made.

The motion for rehearing and the motion for additional findings are accordingly overruled.